**In re Albert HAKIM, Debtor.**

**Bankruptcy No. 96–53628 MM.**

United States Bankruptcy Court,
N.D. California.

Aug. 11, 1997.

Dan A. Craddock, Law Office of Dan A. Craddock, Peter Rehon, Mahl, Rehon, Walworth & Roberts, San Jose, CA, for Debtor.

Nanette Dumas, San Jose, CA, for Office of U.S. Trustee.

Michael J. Yamaguchi, U.S. Attorney, San Francisco, CA, Joan E. Hartman, U.S. Dept. of Justice, Washington, DC, for U.S.

**OPINION**

MARILYN MORGAN, Bankruptcy Judge.

## I. *Introduction*

On May 14, 1996, Albert Hakim filed a voluntary petition for relief under Chapter 11.[1] The largest asset in Hakim's estate is his claim to approximately $12 million held in blocked accounts in Switzerland. These funds were frozen in June 1993 by an injunction issued by the Cantonal Court in Geneva, Switzerland as they are allegedly proceeds of the secret activities of Hakim, retired Air

---

1. Unless otherwise indicated, all statutory references are to the United States Bankruptcy Code, codified as Title 11 of the United States Code.

Force Major General Richard Secord and Marine Corps Lieutenant Colonel Oliver North in the events commonly known as the Iran–Contra Affair.

Before this Court are three motions filed by the United States Department of Justice: a motion to dismiss the Chapter 11 case on the grounds that Hakim's bankruptcy petition was filed in bad faith; a motion to strike Hakim's removal of litigation pending in the United States District Court for the Eastern District of Virginia; and a motion for relief from the automatic stay in order to pursue pending litigation in the Swiss courts or in the Eastern District of Virginia regarding ownership of the funds.

The Court declines to dismiss the Chapter 11 case, but modifies the automatic stay to permit the parties to prosecute all actions involving the funds that are pending before the United States District Court in the Eastern District of Virginia, the Cantonal Court[2] in Geneva, Switzerland, the Swiss Office des Poursuites[3] and any appeals to final judgment. Specifically, the parties may take those actions necessary to assure that funds subject to the injunction issued by the Geneva Cantonal Court are sequestered and to adjudicate Hakim's ownership of the funds.

## II. Facts

### A. The Iran–Contra Affair And The Enterprise

From 1981 to 1984, the United States government, acting principally through the Central Intelligence Agency, provided support to the Contras in resisting the Nicaraguan government. In October 1984, Congress prohibited the support of military or paramilitary operations in Nicaragua. Yet, from early 1984 through late 1986, in what became known as "the Enterprise," Lt. Col. North, on behalf of the Executive branch, coordinated military support for the Contras and applied the profits to efforts to secure the release of American hostages in Lebanon. North delegated the Enterprise's day-to-day financial and operational activities to Maj. Gen. Secord, who recruited Hakim, his business partner. Secord's business relationship with Hakim commenced in the late 1970's through Secord's position as a high ranking officer in the military assistance program in Iran and Hakim's business activities. Secord and Hakim employed Compagnie de Services Fiduciaires, S.S. (CSF) to provide financial services such as bookkeeping, banking and the creation of shell corporations.

The United States has painstakingly reconstructed the Enterprise's records.[4] As a result of the reconstruction, the United States contends that North directed $47,697,653 into the Enterprise's accounts by virtue of his position with the United States government[5] and that the Enterprise disbursed $33,542,738 at North's direction.[6] Secord and Hakim withdrew $1,650,425 traceable to personal business ventures and more than $1,500,000

2. The Geneva Cantonal Court is a general jurisdiction trial court.

3. The Office des Poursuites is a quasi-judicial agency that is authorized to issue attachment and garnishment orders ex parte in favor of purported creditors of a debtor. When contested, the validity of an attachment is determined by a cantonal court having jurisdiction over the parties and the subject matter.

4. See Report of the Congressional Committees Investigating the Iran-Contra Affair, 100th Cong., 1st Sess., H.Rpt. No. 100–433, S. Rpt. No. 100–216 (1987).

5. Of this sum, $11,349,653 was from the Contras in payment for arms, $1,863,000 from private contributions, $2 million from the government of Taiwan to aid the Contras, $1,200,000 from arms purchased for the Contras but actually sold elsewhere, $1 million for delivery of missiles to Iran, $1,685,000 from replacement of missiles sold by Israel to Iran, and $28,600,000 from the Iranian government in payment for missile parts.

6. Disbursements included $11,718,310 for the purchase of arms shipped to the Contras, $381,230 to construct an air strip in Costa Rica to support the Contra resupply effort, $2,239,453 to purchase aircraft for the resupply effort, $214,500 to Contra leaders, $874,281 for aviation equipment, $690,325 for shipping costs, $2,157,903 for fuel, operational, living and other miscellaneous expenses, and $12,237,000 to the CIA for missile parts shipped to Iran. Additionally, the United States contends that Secord and Hakim expended funds for radios purchased for other foreign groups, for efforts by the Drug Enforcement Administration to purchase information related to the hostages, for the purchase of a ship, and for travel and miscellaneous expenses related to negotiations for arms sales.

that could not be traced to any operational purpose of the Enterprise. The United States further contends that Secord and Hakim, through CSF, created false books and documents to hide their personal use of funds. Hakim contends that multiple accounts were necessary to protect the secrecy of the Enterprise's activities.

In November 1986 the secret operations of the Enterprise were publicly exposed. At that time the United States contends that $7,814,899 remained in accounts controlled by Secord and Hakim. The funds have accrued interest and now total approximately $12 million.[7]

### B. *Efforts To Reclaim the Funds*

In December 1986, Independent Counsel Lawrence E. Walsh requested that Swiss authorities freeze the Enterprise accounts controlled by Secord and Hakim and that the funds be returned to the United States government pursuant to the *Treaty Between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters*, 27 U.S.T. 2019. The Swiss Federal Office for Police Matters froze the accounts pending consideration of the United States' request. However, a predicate returning the funds under the treaty was a requirement that the United States obtain a criminal conviction or establish a "reasonable suspicion" of the commission of criminal acts relating to unlawful conversion of the funds.

North was indicted and tried on twelve counts arising from his role in the Iran-Contra Affair. He was convicted of three counts not pertinent to this action,[8] each of which was reversed on appeal. Although Secord was also indicted on charges of fraud related to the handling of the Enterprise funds, all charges against him were subsequently dismissed.

On November 21, 1989, Hakim pled guilty in the United States District Court for the District of Columbia on a single misdemean-

or count of supplementing the salary of Lt. Col. North. On the same date, a civil agreement, dated November 8, 1989, became effective. Under the agreement, Hakim agreed to cooperate fully with all reasonable requests by the Independent Counsel and the United States government to assure return of the funds to the United States government. Hakim agreed to withdraw any claim to funds in excess of $1.7 million and not to impede recovery by the United States of the remaining funds. The United States agreed to withdraw any claim to $1.7 million and not to institute any action to impede release of the funds reserved to Hakim. The United States also agreed to use its best efforts to assure release of the funds to Hakim and to provide information to the Swiss authorities regarding the merits of any claims against the funds. The agreement did not provide for the satisfaction of any tax liability, nor did Hakim admit the existence of a tax liability by executing the agreement.

Both the United States and Hakim maintain that the other failed to fulfill obligations under the agreement. The United States complains that Hakim failed to issue instructions to depositories that would permit the United States to recover the funds and that he induced creditors to attach the funds and failed to oppose the attachments. Hakim asserts that he only agreed to relinquish his claim to funds in excess of $1.7 million so that the United States would provide information to the Swiss courts enabling his creditors to be paid. Since this was never done, Hakim believes he is not bound by the agreement. He denies that there are admissions in the agreement that the funds belong to the United States.

Because the Independent Counsel was unable to obtain criminal convictions of individuals relating to unlawful conversion of the funds, in May 1992 the Swiss Federal Office

---

7. Hakim estimates that $8.5 million is held by CSF, $1.8 million by the Office des Poursuites, $1.9 by the Hyde Park Square Corporation and $50,000 by Stanford Technology Trading Group International, both shell corporations created by Hakim and Secord.

8. North was convicted of aiding and abetting an endeavor to obstruct Congress in violation of 18 U.S.C. § 1505, destroying, altering or removing official National Security Council documents in violation of 18 U.S.C. § 2071, and accepting an illegal gratuity, consisting of a security system for his home, in violation of 18 U.S.C. § 201(c)(1)(B).

for Police Matters denied the United States' request for the return of funds under the Treaty. The United States appealed this decision to the Swiss Federal Tribunal on the ground that the mere indictment of individuals on issues related to unlawful conversion was sufficient to establish a "reasonable suspicion" of the commission of criminal acts. On March 29, 1993, the Federal Tribunal denied the United States' appeal. In its ruling, the Federal Tribunal continued the freeze on Enterprise accounts for 60 days to permit the United States to file an action to determine ownership of the funds. In the interim, on May 21, 1993, the United States obtained a temporary restraining order from the Geneva Cantonal Court precluding disbursement of funds from Enterprise accounts. When Secord and Hakim intervened in the action, the Geneva Cantonal Court also enjoined the disbursement of funds from accounts controlled by Secord and Hakim. The Geneva Cantonal Court ordered that the United States file an action to establish its claim to ownership of the funds in order to continue the injunction.

Its efforts to obtain return of the funds through international treaty and through the civil agreement having failed, on September 20, 1993, the United States filed an action in Switzerland naming Secord, Hakim, the banks and CSF as defendants. The lawsuit asserted ownership of funds remaining in the Enterprise accounts and in Hakim's and Secord's Swiss accounts. The lawsuit was premised upon alleged admissions within the civil agreement with Hakim, Secord's sworn statements before Congress that he had no personal interest in these monies, and an asserted fiduciary duty owed to the United States by Secord and Hakim as agents of the United States government.

In contrast, Hakim contends that he was operating as a private citizen under the auspices of the Chief Executive, Ronald Reagan. Although no writing memorialized the arrangement, Hakim reviewed its legality with his counsel before commencing operations. In sworn declarations Hakim asserts that he had an explicit understanding with government officials that he was expected to obtain financing through private donors, foreign governments or other sources unrelated to federal funds and to operate completely independent of any direction or supervision or involvement of the United States government, using corporate or other business structures on a profit-making basis to achieve the Enterprise's goals. Hakim contends that he incurred substantial obligations on behalf of the Enterprise; he believes that creditors' claims to the funds are valid and he opposes the government's efforts to obtain the funds, declaring that the funds never were property of the United States government.

Hakim raised preliminary exceptions to the Swiss lawsuit, some of which were jurisdictional.[9] Its Swiss counsel advised the United States that if Hakim or Secord prevailed in contesting the jurisdiction of the Geneva Cantonal Court, the funds could be withdrawn without violating the injunctive order unless an appropriate action was pending in a court of competent jurisdiction. As a result, on September 21, 1993, the United States also filed an action in the United States District Court for the Eastern District of Virginia[10] and moved for and received a stay of that action pending disposition of the jurisdictional issue before the Geneva Cantonal Court.[11] On June 9, 1994, the Geneva Cantonal Court confirmed its jurisdiction over Hakim and Secord and stated that it

---

9. These objections were not resolved until late 1996, and Hakim's appeal is now pending.

10. This court is frequently referred to as the "rocket docket" because of the speed with which it disposes of litigation.

11. During the December 3, 1993, hearing on this motion, the United States assured District Judge Bryan that it intended to dismiss the action if the Geneva Cantonal Court found that it had jurisdiction over Hakim and Secord. In opposing the motion, Secord asserted that the Swiss court

would not have jurisdiction over property interests existing in the United States and that the counterclaims asserted by Secord and Hakim address the ultimate issue, the existence of the agency relationship asserted by the United States.

In December 1993, Secord filed a motion seeking to litigate his counterclaim against the United States. On January 14, 1994, the District Court denied the motion. The ruling was affirmed by the Fourth Circuit Court of Appeals.

intended to move towards resolution of the case.[12]

In April, 1996, the United States moved to dismiss the District Court litigation and all counterclaims filed by Hakim and Secord. The United States asserted that dismissal would be appropriate because the Geneva Cantonal Court ruled that it had jurisdiction over Hakim and that decision was final. Further, the United States argued that the Secord's and Hakim's counterclaims should be dismissed because of the lack of subject matter jurisdiction and the failure to state claims upon which relief could be granted. On May 17, 1996, the District Court granted the United States' motion to dismiss the complaint against Secord without prejudice and to dismiss Secord's counterclaims. However, Hakim filed this Chapter 11 case on May 14, 1996, which stayed what the United States assumes would have been a parallel ruling with respect to Hakim.

### C. The Chapter 11 Bankruptcy Case

Hakim's amended bankruptcy schedules show interests in real property with an estimated value of $2,750,000 and in personal property with an estimated value of $7,337,-535.[13] A review of the amended schedules and proofs of claim filed show thirteen creditors asserting secured claims totaling $6,501,-848[14] and eleven creditors asserting unsecured claims totaling $9,717,630,[15] including a claim in the amount of $7,814,899 filed by the United States based on the claim to the funds in Switzerland, a general unsecured claim for estimated taxes in the amount of $1,324,809, and a priority claim for estimated

taxes in the amount of $4,553,587. Total claims against the bankruptcy estate exceed $20 million.

In his plan of reorganization and disclosure statement filed in December 1996, and amended in February 1997, Hakim asserts that he is developing several international trade and merchandising centers. Hakim also anticipates income from his ownership interest in Expand Trade International Affiliates, Inc., a closely-held California corporation, which Hakim describes as the successor in interest to his "business conglomerate," the Enterprise. These projects reportedly include upgrading aircraft, selling telecommunication systems to the Ukrainian government, selling pharmaceuticals and medical and dental training in the Ukraine, organizing and training Ukrainian factory workers and technicians, and constructing a new Ukrainian port facility on the Black Sea.

### D. Positions of the Parties

The United States assaults the validity of Hakim's Chapter 11 bankruptcy case on various grounds: that Hakim's case was commenced in bad faith as a litigation tactic because it was commenced just three days prior to the scheduled hearing in the District Court where Hakim "anticipated" an adverse ruling; that this is essentially a two-party dispute and the estate has no genuine obligations or significant assets; that Hakim's pre-petition conduct is improper as evidenced by the fact that Hakim pled guilty to a misdemeanor count of supplementing North's salary; and that Hakim has no realistic prospects for reorganization since the funds held

---

**12.** Hakim's appeal was denied in the fall of 1995.

**13.** Included among Hakim's personal property are his claim to Enterprise funds estimated at $7,300,000 and miscellaneous household items and a vehicle with a combined value of $37,535. Hakim also includes his stock in Stanford Technology Corporation and Expand Trade International Affiliates, Inc. and his counterclaim against the United States in an unknown value.

**14.** At least five of the secured claims, totaling $4,489,620, are related to legal fees. First, Kalivest Limited has filed a claim secured by a lien on the funds in Switzerland in the amount of $1,196,752, plus 5% interest since May 25, 1993, apparently related to an attachment action. Second, Taggart & Hawkins, a law firm representing Hakim in the United States, filed a claim for

$1,092,858 secured by a lien on the same funds. Third, the Phillipe Neroud Law Firm, Hakim's counsel in Switzerland, is scheduled with a secured claim in the amount of $1 million. Fourth, Janis, Schuelke & Wechsler, a law firm representing Hakim in connection with the Iran-Contra Affair, filed a secured claim in the amount of 1,666,804. Fifth, the Hakim Family Defense Fund is scheduled as having a secured claim in the amount of $400,000.

**15.** Claims totaling $415,900 were filed by persons who may be relatives of Hakim; Taggart & Hawkins has filed an unsecured claim in the amount of $127,000, in addition to its secured claim.

in Switzerland are not property of the estate, but belong to the United States. The United States asserts that the removal of the action from the Eastern District of Virginia was procedurally incorrect and not timely. Finally, the United States urges relief from the automatic stay, arguing alternately that the funds in Switzerland are not property of the bankruptcy estate and that the stay should be lifted for cause to permit continued prosecution of the litigation before the Geneva Cantonal Court.

Hakim responds that he waited until the last minute to file the bankruptcy case because he hoped to resolve the matter amicably and because he could not afford to pay his attorney to oppose the United States' motion to dismiss the District Court action. In addition to the claims of the United States government and the Internal Revenue Service, he owes his lawyers, the Hakim Family Defense Fund and Kalinvast, Ltd. He is presently in default on the loan secured by a first deed of trust on his residence. Hakim argues that the most convenient and economic forum to resolve all issues related to the funds in Switzerland is the bankruptcy court because the litigation in the Swiss courts could last at least three additional years and cost several hundred thousand dollars more, which he cannot afford to pay. Hakim intends to file a new adversary proceeding in this court that would encompass all claims pending before the District Court in Virginia and in the Swiss courts.

Both parties urge that the law governing the issue of ownership of the funds is relevant to whether to dismiss Hakim's bankruptcy case or to modify the automatic stay so that the Swiss litigation may proceed. The United States asserts that the law of Switzerland governs because the funds are on deposit in Swiss bank accounts, many of the entities involved were created in accordance with Swiss law and located in Switzerland, the funds are subject to Swiss attachment, and the disputed oral contract

originated in Switzerland. Hakim, without explanation, counters that the law of the United States controls the issue of ownership of the funds.

### E. Creditor's Rights Under Swiss Law

The parties do not dispute that Swiss law governs the rights of creditors that have attached the funds.[16] A foreign bankruptcy decree from the country of the debtor's domicile may be recognized in Switzerland upon the motion of a foreign receiver or any creditor with the result that the debtor's assets are subject to Swiss laws protecting the rights of creditors.

Creditor's rights under Swiss law are significant to this case because the funds have been attached by various creditors in an unknown amount. Should the Swiss courts determine that the $12 million belongs to Hakim, the attachments will be honored pursuant to Swiss law, perhaps eliminating certain creditors from Hakim's bankruptcy estate. Excess funds, if any exist, would be assets of the bankruptcy estate and should be available to pay the remaining creditors of the bankruptcy estate, such as the claims of the United States.

### III. *Discussion*

This case presents issues regarding the concurrent jurisdiction of this court, the District Court for the Eastern District of Virginia and the courts of Switzerland in resolving Hakim's claim to the funds located in Switzerland. All three motions before the court, and arguably the bankruptcy filing itself, are efforts to alter the forum for this determination.

### A. Hakim's Bankruptcy Case Was Filed For A Legitimate Purpose

■ To determine whether a debtor's case is filed in good faith, bankruptcy courts consider an "amalgam of factors rather than a specific fact." *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir.1994) (*citing In re Arnold*, 806 F.2d 937, 939 (9th

---

16. Enforcement of an unsecured claim in Switzerland is determined by Swiss federal law, initiated with a request for issuance of a payment order through a government administrative office. If opposed, a claimant may apply to the Swiss courts for an order allowing attachment of

a debtor's assets. No limitations are placed upon foreigners bringing or defending actions in the Swiss courts. When a claim is governed by foreign law, the content of the foreign law is established and determined by the Swiss tribunal.

Cir.1986))[17] The test in the Ninth Circuit is whether a debtor is attempting to unreasonably deter and harass creditors or is attempting to effect a speedy and efficient reorganization on a feasible basis. *Marsch*, 36 F.3d at 828.

That the genesis of Hakim's case is a two-party dispute regarding ownership of the $12 million does not, of itself, adversely predetermine Hakim's motives or prospects for reorganization. Many other factors come into play. It is evident from a review of Hakim's amended bankruptcy schedules that his financial straights hamper his efforts to protect his claim to the $12 million and that his creditors are affected by his limited ability to contest ownership of the funds. Clearly, given the severe financial situation confronting Hakim, and Hakim's prospects as represented in his amended disclosure statement, the case is not filed to deter and harass creditors unreasonably, but to maximize the value of the bankruptcy estate. *See Toibb v. Radloff*, 501 U.S. 157, 163, 111 S.Ct. 2197, 2201, 115 L.Ed.2d 145 (1991).

## B. Removal of the Federal Court Litigation is Ineffective

Hakim's attempt to remove the litigation pending in the Eastern District of Virginia to this court is ineffective. Removal under 28 U.S.C. § 1452 effectively removes "any claim or cause of action in a civil action ... *to the district court for the district where such civil action is pending,* if such district court has jurisdiction of such claim or cause of action...." 28 U.S.C. § 1452(a) (emphasis added). The statute is supplemented by Federal Rule of Bankruptcy Procedure 9027, which explains that notice of removal is filed with the clerk for the "district and division within which is located the state or federal court where the civil action is pending." *See Quality Tooling, Inc. v. United States*, 47 F.3d 1569 (Fed.Cir.1995). Thereafter, the district court, or the bankruptcy court sitting by reference, will entertain a motion for change of venue to a bankruptcy court located in another federal district pursuant to 28 U.S.C. § 1412. Hakim filed the notice of removal in this court rather than in the Bankruptcy Court for the Eastern District of Virginia with the result that the adversary proceeding was never effectively transferred. The United States' motion to strike the notice of removal is granted; the adversary proceeding entitled *United States v. Albert Hakim* is remanded to the United States District Court for the Eastern District of Virginia for disposition.

## C. Consideration of Factors for Relief From Stay

Whether to grant relief from the automatic stay to allow this litigation to proceed elsewhere.is undoubtedly the critical issue in this bankruptcy case. Courts have enumerated various factors relevant to relief from stay determinations. Some courts have articulated twelve factors for consideration;[18] other

---

17. Courts often cite a non-exclusive list of factors, including: (1) whether the debtor has only one asset; (2) whether the secured creditors' lien encumbers that asset; (3) whether there are employees other than the principals; (4) whether there is cash flow and available sources of income to sustain a plan of reorganization or to make adequate protection payments; (5) whether there are unsecured creditors; (6) whether there are allegations of wrongdoing by the debtor or its principals; creditors; and, (8) whether bankruptcy offers the only possibility of forestalling loss of the property. *See generally Little Creek Dev. Co. v. Commonwealth Mortgage Corp.*, 779 F.2d 1068, 1072–73 (5th Cir.1986) and its progeny.

These factors are more pertinent in single asset real estate cases, which are distinguishable from a case that is driven by litigation such as Hakim's.

18. The earliest compilation of factors appears in *In re Curtis*, 40 B.R. 795, 799–800 (Bankr.D.Utah 1984). The court identified the following factors, which have also been adopted by the Second Circuit in *In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1286 (2d Cir.1990):

(1) Whether the relief will result in a partial or complete resolution of the issues. (2) the lack of any connection with or interference with the bankruptcy case. (3) Whether the foreign proceeding involves the debtor as a fiduciary. (4) Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases. (5) Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation. (6) Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question. (7)

courts review seven factors;[19] still another court has listed ten factors.[20] However, all of these factors have been identified by courts in balancing the hardships on the parties in the context of federal and state litigation. The concerns expressed by Hakim and the United States are not adequately addressed by the factors normally recited by bankruptcy courts considering whether to grant relief from stay to conclude domestic litigation.

The factors for consideration in the relief from stay context are closely related to those factors a bankruptcy court considers in evaluating whether to abstain from hearing a

Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties. (8) Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c). (9) Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f). (10) The interest of judicial economy and the expeditious and economical determination of litigation for the parties. (11) Whether the foreign proceedings have progressed to the point where the parties are prepared for trial. (12) The impact of the stay on the parties and the "balance of hurt."

19. In *In re Johnson*, 115 B.R. 634, 636 (Bankr. D.Minn.1989), the Court identified seven factors, which are also relied upon the by court in *Edmondson v. America West Airlines, Inc. (In re America West Airlines, Inc.)* 148 B.R. 920, 923–924 (Bankr.D.Ariz.1993):

1. Whether insurance coverage with a duty of defense is available to the debtor or the estate, or, conversely, whether the conduct of the defense will impose a financial burden on the debtor or the estate; 2. Whether judicial economy favors the continuation of the action in the tribunal in which it was commenced, to fix and liquidate the claim which then may be made against the debtor's estate, and to avoid a multiplicity of suits and proceedings involving the same subject matter; 3. Whether the state-court litigation has progressed to trial-readiness, with the likelihood that investment of resources in trial preparation would be wasted if trial were deferred; 4. Whether the issues presented are governed solely by state law, or should be adjudicated by a specialized tribunal with expertise in their subject matter; 5. Whether the litigation involves other parties over whom the Bankruptcy Court lacks jurisdiction, and whether full relief may be accorded to all such nondebtor parties without the debtor's presence in the lawsuit; 6. Whether the creditor has a probability of success on the merits; 7. And, as this Court now recognizes,

civil proceeding that has commenced in state court. Section 1334(c)(1) of Title 28 affords the right of permissive abstention "in the interest of justice and in the interest of comity with state courts or respect for state law." 28 U.S.C. § 1334(c)(1). *See. Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.),* 912 F.2d 1162, 1168 (9th Cir.1990) (*citing In re Castlerock Properties,* 781 F.2d 159, 163 (9th Cir.1986) (affirming court's decision to lift stay for abstention reasons)). An analysis of permissive abstention in the context of § 1334(c)(1) also requires consideration of a variety of factors.[21] However, this analysis presumes the equality of federal

whether the interests of the debtor and the estate would be better served by the resolution of threshold bankruptcy-law issues in the Bankruptcy Court before the court and the parties address the issue of the forum where the claim against the debtor is to be fixed and liquidated.

20. In *In re Marvin Johnson's Auto Service, Inc.,* 192 B.R. 1008, 1014 (Bankr.N.D.Ala.1996), Judge Cohen stated that "in balancing the equities, the Court should consider certain factors. These are:

(1) trial readiness; (2) judicial economy; (3) the resolution of preliminary bankruptcy issues; (4) costs of defense or other potential burden to the estate; (5) the creditor's chances of success on the merits; (6) specialized expertise of the non-bankruptcy forum; (7) whether the damages or claim that may result from the nonbankruptcy proceeding may be subject to equitable subordination under Section 510(c); (8) the extent to which trial of the case in the non-bankruptcy forum will interfere with the progress of the bankruptcy case; (9) the anticipated impact on the movant, or other nondebtors, if the stay is lifted; and, (10) the presence of third parties over which the bankruptcy court lacks jurisdiction."

21. The Ninth Circuit has adopted the factors first articulated in *In re Republic Reader's Service, Inc.,* 81 B.R. 422 (Bankr.S.D.Tex.1987), where Judge Mahoney recited what she considered in deciding whether to recommend permissive abstention:

(1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or re-

and state courts and relies upon the Full Faith and Credit Clause of Article IV of the United States Constitution for its enforcement, with the result that these factors also lack consideration of the issues in the international context.

The Bankruptcy Code provides guidance in international matters only in bankruptcy cases ancillary to foreign proceedings. Section 304 of the Bankruptcy Code is not applicable because no foreign bankruptcy case is pending. However, the section provides some guidance as to the values that Congress seeks to protect, and requires that courts assure the "economical and expeditious administration" of the case.[22]

Finally, the principle of judicial comity does not assist in international stay relief determinations. "Comity" has many different meanings,[23] and its application in the international context is uncertain.[24]

### D. Factors Appropriate for Relief From Stay in the International Context

■ Ultimately, my concerns regarding whether to grant relief from the automatic stay to allow this litigation to proceed elsewhere most closely parallel the United States Supreme Court's concerns regarding federal court abstention in cases of "exceptional circumstances." In *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 818, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976), the Court considered whether a federal district court had properly abstained from hearing a suit brought by the United States on behalf of itself and two Indian tribes, seeking adjudication of reserved rights to waters located in a Colorado water division, where a similar suit was pending in state court. The Court observed that "abstention from the exercise of federal jurisdiction is the exception, not the rule," noting that abstention is generally confined to three categories of federal cases: cases presenting a federal constitutional issue; cases presenting questions of state law "bearing on public policy problems of substantial public import" where a decision would be determinative of state policy; and cases where federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings, nuisance proceedings or tax collection. *Colorado River*, 424 U.S. at 813–817, 96 S.Ct. at 1244–1246. The Court held that the *Colorado River* case did not fall within any of these three categories.

---

moteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of my docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

*In re Tucson Estates*, 912 F.2d at 1167 (9th Cir.1990).

22. Section 304 provides, in pertinent part, that:

... the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—
(1) just treatment of all holders of claims against or interest in such estate;
(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
(5) comity; and
(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

23. "Judicial comity" is defined as "[t]he principle in accordance with which the courts of one state or jurisdiction will give effect to the laws and judicial decisions of another, not as a matter of obligation, but out of deference and respect." Comity also has been defined as "the basis of international law, a rule of international law, a synonym for private international law, a rule of choice of law, courtesy, politeness, convenience or goodwill between sovereigns, a moral necessity, expediency, reciprocity or 'considerations of high international politics concerned with maintaining amicable and workable relationships between nations." Arif S. Haq, *Kaepa. Inc. v. Achilles Corp.: Comity in International Judicial Relations*, 22 N.C.J.INT'L L. & COM. REG. 365, fn. 1(1996) (citations omitted).

24. Joel R. Paul, *Comity in International Law*, 32 HARV. INT'L L.J. 1, 3–4 (1991) (footnotes omitted).

*Id.* However, the Court found that the case presented exceptional circumstances, "unrelated to considerations of proper constitutional adjudication and regard for federal-state relations. . . ." *Colorado River,* 424 U.S. at 817, 96 S.Ct. at 1246. These circumstances prompted "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Id.*

■ The *Colorado River* Court identified four factors relevant to determining whether exceptional circumstances exist to warrant abstention. *Colorado River,* 424 U.S. at 818, 96 S.Ct. at 1247. In *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.,* 460 U.S. 1, 16, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983), the Court added two additional factors, noting that abstention, "does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case . . . ." After review, I believe that these six factors best articulate an appropriate standard for considering relief from stay in the international context, where the interests of wise judicial administration, conservation of judicial resources and comprehensive disposition of litigation are similarly paramount: (1) whether a court has assumed jurisdiction over the res at issue; (2) the inconvenience of the federal forum; (3) the avoidance of piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) which law controls in a choice of laws analysis; and, (6) the adequacy of the alternative forum. My analysis of these factors follows.

### 1. Jurisdiction Over the Res

■ The funds that are the subject of the dispute between Hakim and the Department of Justice are subject to the jurisdiction of the Swiss courts. The funds are located in Switzerland and have been continuously deposited in Swiss institutions since the inception of the Enterprise's activities and are now subject to attachment by various creditors pursuant to Swiss law. It has long been recognized that the court first acquiring jurisdiction over property may exercise jurisdiction to the exclusion of other courts. *Cone,* 460 U.S. at 15, 103 S.Ct. at 936–37 (*citing*

*Colorado River,* 424 U.S. at 818, 96 S.Ct. at 1246).

### 2. Inconvenience of the Federal Forum

Although Hakim is domiciled in the United States and his bankruptcy estate is located here, the Swiss forum is convenient for resolving the ownership of the $12 million. Switzerland is home to many of the witnesses, the place of incorporation of many of the Enterprise's shell corporations and the location of much of the evidence tracing transactions. The parties have invested millions of dollars in legal fees determining the preliminary issues and creating a record in the Swiss courts. Hakim's concerns about the costs to conclude the litigation in Switzerland are misplaced in light of the duplication of effort and cost required to educate new counsel and a new court.

### 3. Order in which Forums Obtained Jurisdiction

The litigation between Hakim and the Department of Justice commenced in the Swiss courts nearly four years ago and has been actively pursued in the interim. To transfer the site of the litigation now would disregard judicial economy and promote forum shopping.

### 4. Avoiding Piecemeal Litigation

Bankruptcy courts, in the context of concurrent state and federal jurisdiction, are familiar with the concerns of avoiding duplicative and wasteful litigation. Hakim and the Department of Justice have litigated for four years the preliminary issues necessary to resolution of ownership of the disputed funds. There is no need to risk the possibility that relitigating issues will generate inconsistent results and additional litigation. *See Colorado River,* 424 U.S. at 818–19, 96 S.Ct. at 1247.

### 5. Choice of Law Analysis

Neither the United States nor Hakim has provided the court with sufficient evidence to determine whether United States or Swiss law governs. Under the circumstances, and particularly in light of the preceding four

years of litigation in Switzerland, this factor should not be significant.

### 6. Adequacy of Alternative Forums

There has been no argument that the Swiss courts or the District Court would fail to protect the rights of the parties. By reputation, there is every reason to believe that Swiss proceedings comport with fundamental notions of fairness. *See In re Koreag, Controle et Revision S.A.,* 130 B.R. 705, 716 (Bankr.S.D.N.Y.1991), *rev.* 961 F.2d 341 (2nd Cir.1992), *cert denied* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992). It is evident that both the United States and Hakim have an adequate opportunity to litigate the claim to the disputed funds in the pending non-bankruptcy proceedings.

### *IV. Conclusion*

The automatic stay is modified for the limited purpose of permitting the United States to litigate ownership of the funds before the Geneva Cantonal Court or to proceed to final judgment in the Virginia litigation. Permitting the United States' claim to be liquidated—that is, to determine who owns the disputed funds—is the best solution for the estate and its creditors, and works no undue prejudice on Hakim.

The Court orders the United States to file a copy of this Opinion with the appropriate authorities in the Geneva Cantonal Court and the Swiss Office des Poursuites. Further, the Court orders both parties to take all actions necessary to assure compliance with the enforcement of this Order and recognition of this bankruptcy case.